UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Sean James McBride

_____

Write the full name of each plaintiff.

-against-

United Health Group et al.

See attached.

_____

_____

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

**26 CV 3226**

_____CV_____

(Include case number if one has been assigned)

**COMPLAINT**

Do you want a jury trial?
☐ Yes    ☐ No

2026 APR 17  PM 3:38
RECEIVED
SDNY PRO SE OFFICE

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 1/9/17

Federal Reserve Board, Reserve Bank of New York, Reserve Bank of Boston, Reserve Bank of San Francisco, Mckinsey and Company, BlackRock, Blackstone, State Farm, Progressive, Geico, Allstate, Liberty Mutual, AIA Group, Apollo Global Management, Apple Inc., Alphabet Inc., Meta Platforms, Inc., Snap Inc., Nomura Holdings, Point72 Asset Management, Leidos Holdings, Inc., Booz Allen Hamilton Holding Corporation, Peter Thiel, Elon Musk, Department of Justice, Department of Defense, National Security Agency, Donald Trump, Jones Day, Federal Bureau of Investigation

## I.    BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☒    **Federal Question**

□    **Diversity of Citizenship**

## A.    If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

1 Constitutional Violations and Civil Rights (42 U.S.C. § 1983/Bivens) 2 Civil Rights Conspiracy (42 U.S.C.§1985)
3 Civil RICO (Enterprise Including Insurance Misconduct)(18 U.S.C.§§ 1962(c), (d)) 4 Computer Fraud and Abuse/Cyber
Intrusion (18 U.S.C.§ 1030) 5 Tortious Interference (NY Common Law) 6 Medical Malpractice/Battery/Lack of Consent
7 Intentional Infliction of Emotional Distress  8 Conversion/Property Interference  9 FOIA Violations (5 U.S.C.§ 552)

## B.    If you checked Diversity of Citizenship

### 1.    Citizenship of the parties

Of what State is each party a citizen?

The plaintiff, _Sean   James   McBride_____ , is a citizen of the State of
(Plaintiff's name)

_New York_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____.

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

Sean                      J              McBride
First Name          Middle Initial          Last Name

215 Railroad Ave
Street Address

Suffolk County, Center Morches        New York          11934
County, City                          State             Zip Code

631-405-9066                   Seanmc2000@yahoo.com
Telephone Number               Email Address (if available)

**Defendant Name, State of Incorporation and State of Primary Business or Residency.**

| Defendant | State / Country of Incorporation | Principal Place of Business or Residency |
|---|---|---|
| UnitedHealthcare | Minnesota | Minnetonka, Minnesota |
| McKinsey & Company | New York (partnership structure) | New York, New York |
| BlackRock | Delaware | New York, New York |
| Blackstone | Delaware | New York, New York |
| Federal Reserve Bank of New York | Federal instrumentality | New York, New York |
| Federal Reserve Board | Federal entity | Washington, DC |
| Federal Reserve Bank of Boston | Federal instrumentality | Boston, Massachusetts |
| Federal Reserve Bank of San Francisco | Federal instrumentality | San Francisco, California |
| State Farm | Illinois | Bloomington, Illinois |
| Progressive | Ohio | Mayfield Village, Ohio |

| | | |
|---|---|---|
| GEICO | Maryland | Chevy Chase, Maryland |
| Allstate | Delaware | Northbrook, Illinois |
| Liberty Mutual | Massachusetts | Boston, Massachusetts |
| AIA | Hong Kong | Hong Kong |
| Apollo | Delaware | New York, New York |
| Apple | California | Cupertino, California |
| Google | Delaware | Mountain View, California |
| Facebook | Delaware | Menlo Park, California |
| Snapchat | Delaware | Santa Monica, California |
| Nomura | Japan (Nomura Holdings) | Tokyo, Japan (U.S.: New York) |
| SAC Capital Management | Delaware | Stamford, Connecticut |
| Leidos | Delaware | Reston, Virginia |

| | | |
|---|---|---|
| Booz Allen Hamilton | Delaware | McLean, Virginia |
| Peter Thiel | N/A (individual) | Florida (primary residence) |
| Elon Musk | N/A (individual) | Texas (primary residence) |
| Department of Justice | Federal entity | Washington, DC |
| Department of Defense | Federal entity | Washington, DC |
| Federal Bureau of Investigation | Federal entity | Washington, DC |
| National Security Agency | Federal entity | Fort Meade, Maryland |
| Donald Trump | N/A (individual) | Florida (domicile) |

## B. Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

_____
First Name                          Last Name

_____
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____
County, City                State              Zip Code

Defendant 2:

_____
First Name                          Last Name

_____
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____
County, City                State              Zip Code

Defendant 3:

_____
First Name                          Last Name

_____
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____
County, City                State              Zip Code

Page 4

## DEFENDANTS, THEIR BUSINESS ADDRESS, AND THEIR SERVICE AGENT'S ADDRESS

| Defendant | HQ / Business Address | Service Agent / Service Address |
|---|---|---|
| UnitedHealth Group Incorporated | 9900 Bren Rd E, Minnetonka, MN 55343 | CT Corporation, 1209 Orange St, Wilmington, DE 19801 |
| Federal Reserve Bank of New York | 33 Liberty St, New York, NY 10045 | Same |
| Federal Reserve Bank of Boston | 600 Atlantic Ave, Boston, MA 02210 | Same |
| Federal Reserve Bank of San Francisco | 101 Market St, San Francisco, CA 94105 | Same |
| Board of Governors of the Federal Reserve System | 20th St & Constitution Ave NW, Washington, DC 20551 | Federal Rule 4(i) service |
| Apple Inc. | 1 Apple Park Way, Cupertino, CA 95014 | CT Corporation System, 330 N Brand Blvd, Glendale, CA 91203 |
| Alphabet Inc. | 1600 Amphitheatre Pkwy, Mountain View, CA 94043 | CSC, 251 Little Falls Dr, Wilmington, DE 19808 |
| Meta Platforms, Inc. | 1 Meta Way, Menlo Park, CA 94025 | CSC, Wilmington, DE 19808 |

| | | |
|---|---|---|
| Snap Inc. | 3000 31st St, Santa Monica, CA 90405 | CSC, Wilmington, DE 19808 |
| BlackRock, Inc. | 50 Hudson Yards, New York, NY 10001 | CT Corporation, 28 Liberty St, New York, NY 10005 |
| Blackstone Inc. | 345 Park Ave, New York, NY 10154 | CT Corporation, 28 Liberty St, NY 10005 |
| McKinsey & Company | 3 World Trade Center, New York, NY 10007 | 3 World Trade Center, NY 10007 |
| Apollo Global Management | 9 W 57th St, New York, NY 10019 | 9 W 57th St, New York, NY 10019 |
| Nomura Holdings | 1 Angel Ln, London / 2 World Financial Center, NY | Nomura Americas, 309 W 49th St, NY 10019 |
| SAC Capital Advisors | Stamford, CT HQ (private offices) | 72 Cummings Point Rd, Stamford, CT 06902 |
| Leidos Holdings, Inc. | 1750 Presidents St, Reston, VA 20190 | CSC, 251 Little Falls Dr, Wilmington, DE 19808 |
| Booz Allen Hamilton | 8283 Greensboro Dr, McLean, VA 22102 | CSC, Wilmington, DE 19808 |

| State Farm | 1 State Farm Plaza, Bloomington, IL 61710 | NY Dept. of Financial Services, One State St, NY 10004 |
| GEICO | 5260 Western Ave, Chevy Chase, MD 20815 | NY Dept. of Financial Services, One State St, NY 10004 |
| Progressive Corporation | 6300 Wilson Mills Rd, Mayfield Village, OH 44143 | NY Dept. of Financial Services, One State St, NY 10004 |
| Allstate Corporation | 3100 Sanders Rd, Northbrook, IL 60062 | NY Dept. of Financial Services, One State St, NY 10004 |
| Liberty Mutual Insurance | 175 Berkeley St, Boston, MA 02116 | NY Dept. of Financial Services, One State St, NY 10004 |
| AIA Group Limited | 1 Stubbs Rd, Central, Hong Kong | 51 Astor Pl, New York, NY 10003 |
| Federal Bureau of Investigation | J. Edgar Hoover Building, 935 Pennsylvania Ave NW, Washington, DC 20535 | U.S. Attorney SDNY + Attorney General |
| National Security Agency | Fort Meade, MD 20755 | U.S. Attorney SDNY + Attorney General |

| | | |
|---|---|---|
| Department of Defense | The Pentagon, Arlington, VA 22202 | U.S. Attorney SDNY + Attorney General |
| United States Department of Justice | 950 Pennsylvania Ave NW, Washington, DC 20530 | Same Rule 4(i) service |
| Donald Trump | Mar-a-Lago, 1100 S Ocean Blvd, Palm Beach, FL 33480 | Same (personal service required) |
| Elon Musk | Tesla HQ, 1 Tesla Rd, Austin, TX 78725 | Same / personal service |
| Peter Thiel | Founders Fund, 1 Letterman Dr, San Francisco, CA 94129 | Same / personal service |

Defendant 4:
_____

First Name                    Last Name

_____

Current Job Title (or other identifying information)

_____

Current Work Address (or other address where defendant may be served)

_____

County, City                  State              Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: Long Island, New York , New York, New York , Smithfield, Rhode Island, Santa Monica, California

Date(s) of occurrence: 2018 - Today , potentially earlier.

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Page 5

In the United States District Court

For the Southern District of New York

Sean James McBride, Plantiff

v.

United Healthcare, McKinsey & Company, BlackRock, Blackstone, Federal Reserve Bank of New York, Federal Reserve Board, Federal Reserve Bank of Boston, Federal Reserve Bank of San Francisco, State Farm, Progressive, GEICO, Allstate, Liberty Mutual, AIA, Apollo Global Management, Apple Inc., Alphabet Inc., Meta Platforms, Inc., Snap Inc., Nomura Holdings, Point 72 Asset Management, Leidos Holdings, Inc., Booz Allen Hamilton Holdings Corporation, Peter Thiel, Elon Musk, Department of Justice, Department of Defence, National Security Agency, Donald Trump, Jones Day, Federal Bureau of Investigation

Defendants civil action Nos.:[to be assigned]

Complaint for Damages and Injunctive Relief

TABLE OF CONTENTS

| | | |
|---|---|---|
| | 1 | Parties |
| | 2 | Jurisdiction & Venue |
| | 3 | Factual Background Overview |
| | 4 | Plaintiffs Interests and Good Faith with Federal Reserve |
| | 5 | Detailed Factual Allegations |
| - | 1 | Insurance |
| - | 2 | Federal Reserve System |
| - | 3 | 2/5/2023 Memo |
| - | 4 | Reputational & Defamatory Coordination |
| - | 5 | Medical Harm as a Tool for Conspiracy |
| - | 6 | Medical Events |
| - | 7 | Resident Upstairs |
| - | 8 | Aly Kovarik Social Media |
| - | 9 | John Kovarik |
| - | 10 | Leslie McBride Business |
| - | 11 | Neighborhood |
| - | 12 | Poisoning |
| - | 13 | Family & Insurance Schemea |
| - | 14 | Labor |

- 15    Ready Willing and Able
- 16    Meta Data & Social Media
- 17    Homelessness & Housing Prevention
- 18    Hate Crimes
- 19    Evidence Suppression & Inculpability

6    Pattern of Coordinated Conduct & Alleged Conspiracy

7    Causes of Action

## 1. PARTIES

Plaintiff , Sean James McBride, is a natural person and resident of Manorville, New York.

Defendants are listed in the caption and include corporations, government agencies, and individuals alleged to have participated in coordinated actions against Plaintiff.

---

## 2. JURISDICTION & VENUE

This court has subject matter jurisdiction pursuant to [statutes], including federal civil rights and tort claims.

Venue is proper in this district because a substantial part of the events giving rise to this claim have occurred here, including interactions with Federal Reserve officials, corporate defendants, and other activities affecting plaintiff.

---

## 3. Factual Background Overview

Over a 7 year period, Plaintiff has been subjected to multiple forms of interference and harm by defendants, including:

- Cyber & Digital Intrusions

- Medical Harm & Negligence

- Reputational Harm & Defamation

- FOIA & Evidence Suppression

These harms are alleged to be coordinated and deliberate, cumulatively affecting Plaintiff's personal, professional, and social life.

———

4. Plaintiff's Interest and Good Faith with Federal Reserve

7        Plaintiff developed a professional and personal interest in the Federal Reserve System, including networking with officials in 2018 and participating in an interview for an employment opportunity in 2021.

8        Beginning in 2019, Plaintiff initiated professional interactions with Federal Reserve officials, unrelated to FOIA or record requests.

9        Plaintiff's interactions were initially routine, but overtime became subject to digital, reputational, and extralegal interference.

———

5. Detailed Factual Allegations

INSURANCE

10       The plaintiff is subject of insurance fraud.

11       Fed actors perpetuate UCR benefits on behalf of insurance companies. Tech companies were used as instruments into the plaintiff's life by private interests. Repeated coordinated actions against the plaintiff establish a common purpose. Government actors failed to protect the plaintiff. Standard industry practices and it is what it is is a mechanism for this scheme. Each defendant took a role in this scheme.

12       Federal agencies hired consultants, contractors, security experts to further a schedule to impede plaintiff as to benefit businesses in the private sector. Defendant(s) common purpose is to profit in insurance and other business by means of labeling plaintiff as a key person either directly by defendant(s) or implicitly and subsequently labeling plaintiff as a high risk person for the purposes of raising industry wide UCR rates. Behavior in furtherance includes all statements herein. Public and private actors had knowledge of the scheme, exercised ignorance of reporting such a scheme, and profited from this scheme. Implicit agreements connect the individual actors into an enterprise. Each defendant took a role in this scheme.

13       In unison, with mutual assent, defendant(s) manipulated, coerced, and targeted plaintiff to intentionally create a risky insurance bellwether of plaintiff and plaintiff's demographic, stealing from a vulnerable class of policyholders and stoultifying the perceived pain inflicted on the plaintiff.

14       Defendant(s) used a bellwether program against plaintiff, a key person to inputs, to falsify a need to overcharge premiums on new policies, across industry, targeting a specific demographic.

15      Defendant(s) targeted the plaintiff to reduce the need for a strong insurance program for young people and for people in the plaintiff's demographic. Key persons being labeled as high risk such as the plaintiff and Luigi Mangione increase the need for insurance companies to unjustly overcharge rates to individuals in the demographic in question.

16      During the time of greatest interference, 2023-2025 insurance earnings have increased as follows: Allstate 250M-9.3B, Progressive 3.62B-10.73B, Liberty Mutual 213M-6.8B, State Farm -6.3B-12.9B, Geico 3.6B-6.8B, AIA 3.764B-6.23B, Apollo 4.1B-5.2B. Revenue for UNH increased 371B-447B.

17      Defendant(s) used circumstances and family member malleability against plaintiff to falsify program needs. Plaintiffs father is a target of influence attack. Plaintiff has kept under fathers thumb for insurance purposes and plaintiff couldn't explain with smoking gun how his father is under attack although he assumes it's a technological manipulation. Several times while plaintiff is becoming independent and working on his financial business the father puts a milestone on his neck, in part to his fathers desire and in part to the desire of the defendant(s), inadvertently on his fathers part and intentionally of defendants part hurting plaintiff. This occurred regularly and more frequently in early 2024, the summer of 2024 and December 2024. Plaintiff alleges defendant(s) used fathers cyber data to incite and light a fire under plaintiff to intentionally expose him, steal social capital from the plaintiff and create a product that would advance their business interests.

18      Insurance companies categorize individuals and groups on a risk basis.

19      Insurance companies look at medical history to evaluate profiles.

20      Insurance companies look at current health status to evaluate profiles.

21      Insurance companies look at family history to evaluate profiles.

22      Insurance companies look at prescription history to evaluate profiles.

23      Insurance companies look at drug use to evaluate profiles.

24      Insurance companies look at demographic to evaluate profiles.

25      Insurance companies look at occupation to evaluate profiles.

26      Insurance companies look at hobbies to evaluate profiles.

27      Insurance companies look at driving records to evaluate profiles.

28      Insurance companies look at criminal history to evaluate profiles.

29      Insurance companies look at location of residency to evaluate profiles.

30      Insurance companies look at travel to evaluate profiles.

31      Insurance companies look at credit history to evaluate profiles.

32      Insurance companies look at financial stability to evaluate profiles.

33      Insurance companies look at housing stability to evaluate profiles.

34      Insurance companies look at insurance & claims history to evaluate profiles.

35      In unison, with mutual assent, defendant(s) manipulated, coerced, and targeted plaintiff in the area of 18-34 characteristics on an individual basis, causing harm to him on purpose.

36      The plaintiff alleges a broader conspiracy of financial/ insurance activity occurred at the expense of his profile.

37      The plaintiff alleges the defendant intentionally created risky & dangerous circumstances in the plaintiff's life.

38      The plaintiff had a strong profile of characteristics 10 years ago.

39      The plaintiff's characteristics have become stoultified into a thin, unhealthy homeless man exhibiting problems in the aforementioned lines 18-34

40      The circumstances of the plaintiff's profile created an opportunity to control, manage, and plausibly take advantage of risk and premium, not only attributed to the plaintiff, but also groups with shared attributes through the use of usual, customary and reasonable benchmark rates for all insurable risks.

See Appendix (I)

41      Defendant(s), in any way, induced or affected any event or events included in, but not limited to Appendix (I).

42      Defendant(s) at any time utilized a mechanism to cause pain and suffering, financially, socially, health wise, domestically, in relation to housing and occupation, and neurologically to plaintiff. Plaintiff alleges defendant(s) utilized "business as usual" as a mechanism against him.

43      "Business as usual" is a tool for conspiracy.

44      Defendant(s) at any time utilized contractors or employees to directly cause pain and suffering, financially, socially, health wise, domestically, in relation to housing and occupation, and neurologically to plaintiff.

FEDERAL RESERVE SYSTEM

See Appendix (F)

45    The Federal Reserve upholds the "business as usual" mechanism, such as John Williams "business more like usual" directed toward the Economic Club of New York on 9/27/21 referring to the attitude at the FED. We can also see based on FED interest rate business covering for large corporations while targeting young income earning professionals.

46    The direct cause or founding opportunity of insurance fraud & conspiracy against plaintiff is the plaintiff's behavior in Appendix (F), a routine employment interview process.

47    The defendant(s) at any time held an interest financially or otherwise in items listed in Appendix (F) Appendix (I).

48    All wrongdoings of federal agency, corporation, or individual are included under a conspiracy, personally against the plaintiff. Plaintiff believes the Federal Reserve saw an opportunity to extort plaintiff during his interview proceedings and subsequently took action and made decisions to boost profitability of insurance companies and associated contractors and business.

49    Defendant(s) has kept any record of the plaintiff.

50    Defendant(s) has kept any record of events in Appendix (F).

51    Defendant(s) has used a program to inhibit the plaintiff.

52    Defendant(s) has done any business at the expense of the plaintiff.

53    Defendant(s) used negligent tactics on the plaintiff.

54    Defendant(s) used aggressive hostilities on plaintiff.

55    Defendant(s) used an unspoken quid pro quo to take advantage of the plaintiff.

56    All or some aspects of the plaintiffs insurance profile have been intentionally misaligned for the use of bolstering defendants personal businesses.

2/5/2023 MEMORANDUM

57    Defendant(s) kept records of any information relating to the plaintiff.

58    2/5/2023 MEMORANDUM was written by the plaintiff to protect himself and to document statistical improbability and recognize a complex surveillance system's interest in him, personally. Plaintiff recognizes social events around NYC that he believes is the FED or government actors operating in a project, concert or effort.

Appendix (M)

59    Defendant(s) spied on the plaintiff.

60      Defendant(s) spied on the plaintiff with mal intent or with suspicion that spying on the plaintiff would put him at risk.

61      Defendant(s) illegally surveilled the plaintiff compromising his 4th amendment rights.

62      Defendant(s) stole plaintiff's intellectual property, social capital and first amendment rights.

63      Defendant(s) labeled the plaintiff as a good target or key person.

64      Defendant(s) has on file a copy of Sean James McBride memo 2/5/2023.

65      Plaintiff wouldn't have written the 2/5/2023 memo unless he deemed it to contain a protective documentation function in his life. Plaintiff feared seeing people in public who were clearly part of a surveillance system.

66      2/5/2023 memo reflects the confusion of the plaintiff.

67      Plaintiff becomes injured in his confusion and injures himself in the confusion.

68      2/5/2023 memo mentions dealing and pressure from the Federal Reserve System and the National Security Agency.

69      2/5/2023 mentions the plaintiff's account of being harassed in public.

70      2/5/2023 holds the Federal Reserve System and National Security Agency in respectable terms, indicating good faith from the plaintiff.

71      Despite not gaining employment, the plaintiff still respects the Federal Government, the plaintiff doesn't take any negative actions or revenge.

72      2/5/2023 reflects the plaintiff's trust and dependence on the Federal Reserve System and the National Security Agency.

73      Plaintiff expected some level of intelligence actors to be protecting him.

74      Defendant(s) made defamatory statements about the plaintiff, specifically relating to events surrounding Appendix (F).

75      Defendant created a defamatory and injurious crucible about plaintiff before, during, or after the events detailed in 2/5/2023 memo. Plaintiff believes the Federal Reserve intentionally risked the plaintiff to the grape vine and allowed, exacerbated or encouraged malicious conduct.

76      Any leak of information, data, or other relating to the plaintiff was known by the defendant(s).

77    Any leak of information, data, or other relating to the plaintiff was caused by defendant(s).

REPUTATIONAL & DEFAMATORY COORDINATION

78    Defendant(s) was aware of plaintiffs financial career prior to complaint, during employment proceedings with the Federal Reserve System, or earlier.

79    Defendant(s) took any interest in plaintiffs career, employment, education, network, social life or community prior to complaint.

80    Defendant(s) made business or government decisions based on any aspect of the plaintiff.

81    Plaintiff can tell from his own experience that defendant(s) have defamed him. Plaintiff can tell this due to his account in his 2/5/2023 memo, phone algorithm, and other circumstantial evidence. Plaintiff can recognize social evidence and personal outcomes as an effect of an unwanted attention.

82    Defendant(s) ability to populize plaintiff through national security means can and has led to financial outcomes and financial decision making regarding plaintiff.

83    Professionals with financial services education and experience rely on their reputation to build successful networks and business in future. Plaintiff works for himself on a financial portfolio business. Should the plaintiff go to raise money or take on clients he will be a laughing stock to systemically important individuals in local and national security systems. Competitors will forever take advantage of the plaintiffs visage that's come out of the attacks against the plaintiff. Plaintiff is now seen as a disturbed individual rather than someone capable of taking care of himself and business. Defendant(s) attacked plaintiffs reputation.

84    Steering what is known about a professional will affect their reputation.

85    Defendant(s) does any business in asset management, custodianship, financial advising, wealth management, cash and alternative investments, hedge fund, private equity, private or public debt business or custodianship, market making, investment bank, book running, commercial bank, reserve banking, insurance, or other financial business, or, consults, advises, holds accounts with, contracts or deals with these business in any other way.

86    A person who studied finance, law, and politics might choose to work in one of the above businesses.

87    A person such as a plaintiff running a hedge fund will be competing with the types of companies mentioned in line 77.

88    The plaintiff studied finance, politics and law in undergraduate.

89      The plaintiff works in financial businesses from 2018-today.

90      Plaintiff runs a hedge fund business which he runs from September 2023 - Today.

91      Plaintiffs business returns are 29764% in paper trading. In other words, plaintiffs trading account, in non-real dollars has increased 3M-897M in 2.5 years.

92      The plaintiff worked in a NYC office building in summer 2021.

93       The plaintiff has worked establishing a track record of success in business.

94      Plaintiff has a public reputation on the internet and in the intelligence community in the context of his professional life.

95      Plaintiff's reputation is important to his ability to generate income and support himself.

96      If plaintiff's allegations of systemically influential individuals having knowledge of conduct herein is true, his ability to be a successful working professional is permanently beleaguered.

97      Defendant(s) inhibited plaintiffs ability to make money and hold employment.

98      Defendant(s) supported, in any way, circumstances that have defamed or targeted the reputation of Sean James McBride.

99       Defendant(s) targeted plaintiff's health, family & friends, business network, social media, cyber behavior, framed him as a bigot, deprived plaintiff of his human rights and conspired to disenfranchise plaintiff for the purposes of him being seen in a risky, negative light by important insurance evaluations.

100      Plaintiff alleged defamatory behavior began as a result of leak information at the Federal Reserve Bank of New York sometime at the end of 2022 or the beginning of 2023.

101      Plaintiff alleges the behavior continues until now.

102      Plaintiff was targeted as a risk reduction measure by Federal agencies.

103      Plaintiff was targeted as a means of generating more business by private defendants.

MEDICAL HARM AS A TOOL FOR CONSPIRACY

104      The defendant(s) used a pattern of attacks described in the next section under an enterprise. The consistency, timing, and interdependence of defendants attacks would not be possible absent agreement among them.

105     Defendant(s) ruined the plaintiffs health as a basis for explaining or justifying exorbitant insurance rates for like individuals.

106     Defendant(s) used medical harm as a tool for conspiracy.

107     Defendant(s) used an implicit agreement to medically harm the plaintiff.

108     Medical harm caused to the plaintiff coordinated directly to insurance, financial, and government outcomes.

109     Medical harm against the plaintiff furthered a shared and desired outcome.

110     Medical harm against plaintiff fraudulently represented plaintiff's insurability risk.

MEDICAL EVENTS

111     Defendant(s) furnished health events in plaintiff's life.

112     Defendant(s) used Sean James McBride's state of health to their personal or business gain.

113     Defendant(s) created unhealthy and dangerous circumstances for the plaintiff.

114     Defendant(s) used health events maliciously.

115     Defendant(s) framed plaintiff using diagnostic practices and diagnoses in an untruthful, dishonest and contemptuous manner.

116     Plaintiff alleges a serious assault on his system beginning in September 2023.

117     Plaintiff describes a "bug" as some internal device, "like a pacemaker" with the ability to traverse the internal space of his body and lacerate organs, tissue and muscle. Plaintiff experienced sharp pains as well as queasy and drawn out pains of manipulation in his system.

118     Defendant(s) is responsible for this "bug" and subsequent manipulation of plaintiff's system. The plaintiff doesn't know how it got in his body or how it is controlled.

119     Defendant(s) compromised plaintiff's neurological function.

120     Defendant(s) compromised plaintiff's muscular function.

121     Defendant(s) compromised plaintiff's bowel function.

122     Defendant(s) compromised plaintiff's organ function including, but not limited to, stomach, intestine, heart, brain, bladder, liver, lungs, diaphragm, pancreas, gall bladder.

123     Defendant(s) performed health activities on the plaintiff without consent.

124    Defendant(s) used foreign devices to implement a medical corruption of plaintiff.

125    Defendant(s) put a device in the plaintiffs body that would cause the plaintiff to bleed internally and impair neurological function.

126    Plaintiff experiences regular events of internal bleeding, of which he suspects are part of a conspiracy for insurance purposes. How long until the plaintiff goes to the doctor? Does the plaintiff talk to a family member about this? If these circumstances ensue how will the plaintiff react or respond? All measured to evaluate the plaintiff in an optimal insurability context.

127    Today, and on a daily basis, the plaintiff feels his heart at a rapid rate, sometimes, with bleeding.

128    Between June 2024 and September 2024 the plaintiff experienced heart attack symptoms and internal bleeding, aggressively, on a regular basis.

129    Some internal health symptoms would last weeks.

130    Between June 2024 and September 2024 plaintiff experienced an episode of induced brain bleed.

131    Between June 2024 and September 2024 plaintiff experienced heart bleed and stomach lacerations at work as a custodian.

132    Between June 2024 and September 2024 plaintiff experienced his heart being lacerated on each artery and vein of blood flow, simultaneously, on multiple occasions. Plaintiff would feel his heart drained of blood and subsequently the muscle would struggle and commence, presumably from healing properties.

133    One such occasion in the summer, plaintiff was lying in bed watching the show "Treehouse Masters", heart activity began, the plaintiff's heart was lacerated at the front of the body, inducing internal bleed and heart beat 5X normal rhythm, so serious that plaintiff turned over and applied pressure to his chest to keep blood flow. Plaintiff thought he was going to die. Plaintiff thought that he was being monitored and that emergency services would just show up at the house because of how serious the preceding pain had been and how irregular the plaintiffs behavior was at this point. Plaintiff believed enough intelligence community red flags as to his behavior would protect him. Plaintiff was woosy although didn't seek medical help at this time. Plaintiff alleges this attack was personal with the purpose of making him feel powerless. Defendant(s) caused this incident intentionally.

134    On a constant basis in the summer 2024, plaintiff thought he would be killed because of his conduct with the Federal Reserve and decision to not work for a low wage on Wall Street. The plaintiff can't certainly know who was behind these personal attacks, adding to the stress of these events. Plaintiff was testing how bad the unexplained health events were, by golfing in the yard one day, internal bleeding events insued. Plaintiff couldn't do anything

productive for long bouts of time, rendering him useless and scared. Plaintiff believes defendant(s) were stimulating him in various ways, which he rejected, causing him to insulate himself from friends, family, and the world.

135     Plaintiff felt these disruptive events everyday and thought he was going crazy. Plaintiff can only recall moments of serious high stress.

136     Plaintiff worked during the day at the East Moriches School District in August 2024, he would come home at 3pm and nap following work. Every time he would have internal bleeding and pains in his brain.

137     Plaintiff experienced regular sleepless nights due to the pain he was experiencing.

138     Plaintiff worried he was only a collateral for some government dealing involving insurance and this couldn't have been a personal attack at the time although plaintiff may have underestimated himself at the time, plaintiffs behaviors certainly could've provoked a personal attack. Plaintiff alleges some lobbying activity or political activity that defendant(s) had done created this perception. The health problems plaintiff was going through continued before during and after the election. Plaintiff turned off most of his apps during this time to deflect cyber threats. Plaintiff alleges that in accordance with serious political and government business plaintiff was foisted by defendant(s) like a Nielsen family would be to the media business.

139     Plaintiff experienced brain death.

140     Plaintiff brain death experience account - A feeling of physical paralysis. Knowing my brain's activity was slowed, feeling the sensation of having the last neurological ability level my head. Certainly an aspect of blood flow and oxygenation that I can't understand how my body was deprived of. Unable to move and unable to think, I passed out, to wake up groggy the next morning.

141     Every time the plaintiff would go on a regular walk he would feel things, physically in his brain, and mentally. The plaintiff believed the defendant was using some device to scare him, control him and injure him.

142     On August 28th and September 1st 2024 plaintiff sought medical help from Stony Brook University Hospital.

143     Plaintiff decided to not take anti-psychotics offered to him on August 28th from Stony Brook CPep in the emergency room. The plaintiff was experiencing physical ailments and didn't think he needed medication to fix this.

144     A week after his initial emergency room visit, on September 1st, plaintiff drove himself to the same facility, asking if he could begin the prescription; he was kept in an inpatient facility overnight, against his will, for no sufficient reason. The plaintiff received the medication overnight. Plaintiff alleges this overnight stay was intended for insurance purposes.

145    The same night the plaintiff requests a prescription and is held in an inpatient facility, a doctor diagnoses the plaintiff as "schizophrenia". Plaintiff and subsequent medical analysis determine this is a false diagnosis.

146    This false diagnosis pops up and continues to be a problem for the plaintiff in subsequent medical interventions.

147    Doctors didn't use any procedure to make the diagnosis.

148    Doctors are guilty of negligence against the plaintiff.

149    Plaintiff sees shallow nature of the intake as being connected to private effort of defendant(s) to invalidate plaintiffs claims and study plaintiff's behavior in the facility, for insurance purposes.

150    Plaintiff began seeing a therapist on September 2nd, Hindi Mermelstein, the same day he was discharged from Stony Brook.

151    Plaintiff saw Dr. Mermelstein in Glen Cove on 3 occasions.

152    Plaintiff took anti-anxiety and anti-psychotic drugs by order of Dr. Mermelstein for a short time before plaintiff stopped taking the drugs and kept the drugs for "as needed" dose. Dr. Mermelstein diagnosis plaintiff as Psychosis attributed to substance use.

153    Health events again began, during work, during off hours and created another emergency room event for the plaintiff. Plaintiff alleges defendant(s) insinuated pain to measure plaintiffs barometer of tolerance for pain and discomfort, also to see what plaintiff did to prevent the activity.

154    In November, at Lowe's, plaintiff would have similar moments of physical pain, sometimes while he was discussing something with a coworker or moving/ lifting heavy objects or using machinery. Plaintiff alleges that defendant(s) insinuated these pains.

155    In November, plaintiff would come home from working the night shift early in the mornings, about 6 am.

156    Every morning the plaintiff came home from work he can recall he would have serious bowel activation and internal laceration in the stomach area.

157    One night on November 5th 2024 the heart attack symptoms occurred sharply and the plaintiff drove himself to Peconic Bay Medical Center.

158    The visit to emergency care was largely unhelpful and the plaintiff determined he was not getting adequate care. The plaintiff got IV fluids and didn't know how to proceed. Doctors weren't providing the right answers to his injuries and issues.

159     Plaintiff believes his family connection to SBUH, his grandmother, a teacher at the hospital and friend connection to PBMC, John Kanas, for whom the hospital is named for, might have been part of an underlying reason for why he was in pain and being personally targeted to be distressed in these locations. Plaintiff has been targeted and recognized very subtle and sensitive pattern. The attacks against plaintiff were tailored to disturb him.

160     Plaintiff grew up exposed to healthcare and he may have been labeled as a good barometer for health insurance at some point.

161     Plaintiff was run out of town intentionally by agency and corporation defendants. For insurance purposes.

162     Plaintiff took his family minivan and drove cross country December 7th 2024.

163     Plaintiff feared for his life due to internal health activity.

164     Plaintiff began seeing a therapist in Los Angeles in February, Gaea Woods.

165     Plaintiff continued to experience brain, heart and muscular events on a regular basis.

166     In April 2025, plaintiff was approached on 4th st and in the Santa Monica library, without any basis for knowing his location. He was approached by a family member, the plaintiff's father, police officers, and by employees of Brad Richards convincing the plaintiff to move off of the street. Plaintiff alleges these consultants were employed or retained by another agency and operating under false pretense or ignorance.

167     Plaintiff agreed to check in to a location, Montaire Behavioral Health for 1 month stay for a therapy on April 12th 2025.

168     Plaintiff went through a therapy regime at Montaire Behavioral Health for 1 month.

169     Plaintiff alleges the professionals at the house were operating to intentionally disturb the plaintiff, likely ignorant of what was happening to the plaintiff outside the facility and internally. Plaintiff alleges the setup of the house was an insurance program to insulate the defendant(s) from New York who followed plaintiff's footprint to Los Angeles. Defendant(s) risks young professional careers at Montaire Behavioral Health who plaintiff would likely grow angry with due to the coordinated nature of the attacks. Plaintiff as a patient had opinions about the treatment that would be valuable to financial and insurance companies. Sentiment of Montaire Behavioral Health professionals was used for insurance program to buffer the plaintiffs agitators.

170     Plaintiff believes his participation in Montaire Behavioral Health is a distraction and ruse for what was happening to the plaintiff.

171     The plaintiff left the facility on May 12, 2025 and began living in the Palisades Park with no shelter.

172     Plaintiff alleges defendants were affecting plaintiff experience in the Park through usual means of brain bleeding, heart bleeding, muscular spasms, but also what he was seeing in the park such as furnished arrangements and events.

173     Plaintiff thinks he is a public or attractive nuisance at this time for various individuals in Los Angeles. Plaintiff witnesses a lot of strange behavior in the park but can't prove he is an attractive nuisance for private or public interest.

174     In these times the plaintiff realized his health activities including routines, working out, and eating were disgraced and irregular. (A feature of his insurance profile is consistency, deeper than only the health activities.) Defendant(s) intentionally strayed plaintiff from his routine by causing health events and disturbances in the plaintiff's life.

175     Plaintiff contacted NSA with FOIA request during this time to assist in producing evidence of health wrongdoing. Plaintiff made subsequent FOIA requests to NSA on 8/25, 10/19, 11/17, 2/9, 2/27, 3/4 and 3/16.

176     Plaintiff drove back to New York with family on October 20, 2025.

177     Defendant(s) caused aspects of intimidation of plaintiff relating to his father and mother insisting he needed a mental evaluation. This argument caused the family strife and broke up the family due to some insinuation or idea that plaintiffs father had to get him help.

178     Plaintiffs father invited a referred therapist to the family home and insisted plaintiff speak to him. A therapist named Ralph met with the plaintiff on this occasion over an afternoon, also in 1 video call. Plaintiff assessed based on his own experience and understanding of his needs that he did not in fact need this therapist at the time and Ralph and plaintiff agreed to not meet. Plaintiff also began realizing his legal position at this time and thought seeing this therapist would further feed mental and physical health attacks.

179     Plaintiff is informally evicted from his family home due to arguments with his parents about Ralph and inadequate communication that plaintiff alleges was caused by some influence over his father by defendant(s).

180     Dash emergency response intervened on plaintiff in March 2026 while plaintiff was in temporary emergency housing due to disagreements between plaintiff and the roommate at the Greenview Inn facility. Dash evaluated plaintiff and subsequently evaluated and referred plaintiff for care.

181     In preparation of this court case and in recovery from the suffered emotional and psychological strife, plaintiff seeked out a long term therapy from Family Service League in Riverhead. Plaintiff began taking 2 prescriptions in recovery effort on the expertise from psychiatrist at Family Service League.

182    Plaintiff is still suffering from internal attacks as of April 2026.

183    Plaintiff is working to address traumas and injuries through therapy.

184    Defendant(s) knew of psychological, emotional, financial, and reputational harm being done to the plaintiff and continued their practices aware of these harms.

185    Defendant(s) impeded plaintiff's ability to recognize and record health events or other disturbances.

186    Defendant(s) used plaintiff's visits to medical professionals to obscure their wrongdoing.

187    Defendant(s) recorded plaintiff's medical and other behavior.

188    Defendant(s) used any related events for their personal gain.

189    Defendant(s) used plaintiff's health to destroy inculpatory evidence of plaintiffs uninvolment with defendant(s).

190    Defendant(s) used health events to limit plaintiffs future outcomes or to negatively affect plaintiff's wall st. career.

191    Defendant(s) created legal loopholes to avoid culpability.

192    Defendant(s) created social convention and mutual assent to avoid culpability.

193    Defendant(s) observed plaintiff's pain and suffering via any means.

194    Defendant(s) studied plaintiff's health.

195    Defendant(s) studied plaintiff's health events.

196    Defendant(s) was aware of what was happening to plaintiff's health.

197    Defendant(s) created circumstances to incentivize health events occurring to the plaintiff.

198    Defendant(s) created financial gain and other gain from plaintiff's health events.

199    Defendant(s) attempts to create an incapability feature and unreliability in the plaintiff, leaning on health emergencies, false diagnosis and furnished life events to invalidate and control the plaintiff's future. Defendant(s) wish for plaintiff to appear irresponsible regarding his own health and medical conduct

PARK ROYAL UPSTAIRS RESIDENT

200     Early 2024, Park Royal apt #1514, the above apartment to plaintiff's Upper West Side apartment building, works or contracts with the defendant(s) to disturb plaintiff.

201     Resident used emotional and mental distress tactics on plaintiff in #1415.

202     The resident targeted and intimidated the plaintiff with various disturbances in the Park Royal in early 2024.

203     The resident harassed plaintiff with disturbances such as coordinated stomping, repetitive noise, and late night disturbances above plaintiff's bed.

204     The resident intended to make it difficult for the plaintiff to work, sleep, cook, or do any other activity inside via auditory disturbances.

205     Plaintiff's apartment is directly below resident in #1514.

206     Plaintiff alleges these incidents are coordinated to efforts to reduce plaintiff's security, eventually leading to plaintiff being intimidated out of NYC and NY.

207     Plaintiff believes the upstairs resident's purpose of moving into the apartment was to monitor the plaintiff.

208     Plaintiff is unaware of apartment 1514 owner or tenant identity.

209     The resident was involved in cyber activity relating to the plaintiff.

210     The resident was involved in lobbying, financial, banking, media, insurance, or other activity relating to the plaintiff.

211     Behavior became problematic in the first months of 2024 and into the summer. Plaintiff alleges the resident was acting on the behalf of defendant(s).

212     Plaintiff attempted suicide by hanging due to fear and intimidation from resident.

213     In this moment plaintiff hears resident scrambling above him at 3am further proof that resident was monitoring plaintiff's activity somehow.

ALY KOVARIK SOCIAL MEDIA

214     Plaintiff's friend, Aly Kovarik is known to the defendant(s).

215     Aly Kovarik is mentioned or subject in any file or communication of defendant(s).

216     Defendant(s) created a fake social media account in the likeness of Aly Kovarik.

217     Contractors or associates of defendant(s) created fake social media accounts in the likeness of Aly Kovarik.

218     Defendant(s) used cyber intrusion to manipulate Sean James McBride and Aly Kovarik in any way.

219     Defendant(s) manipulated Sean James McBride or Aly Kovarik in any way.

220     Defendant(s) manipulated or coerced Aly Kovarik. Plaintiff believes she is somehow being employed by defendant(s) indirectly for a company called BL Companies. Plaintiff believes this is a humorous attempt to frustrate plaintiff relating to banners, "Big Law Companies", "Blackstone Companies" or "Blackrock Companies".

JOHN KOVARIK

221     On 11/3/2023, 4am, plaintiff went to the house of his friend Aly Kovarik. His phone data was manipulated prior to the event. Plaintiff was under the impression that his friend was in some compromising situation due to what he was interpreting on his phone through text, social media, a language app. A week prior to 11/3/2023 plaintiff experienced a sleepless night terror. Noises in his bedroom such as the side of the house, in the wall and gutter made plaintiff believe he was being contacted by some intelligence person who was attempting to either protect or coerce plaintiff. Plaintiff alleges this incident was caused by defendant(s) and made him worry about his friends safety.

222     Plaintiff boils over these events for a week, along with interpreted cyber activity.

223     Plaintiff drives to Kovarik home on 11/3/2023 and asked Mr. and Mrs. Kovarik to remove Aly from school at Penn St because of the risk he believed she might be in. Plaintiff believed someone who was spying on him, his family and Kovarik family was undercover as a student at Penn State hoping to befriend her as an influence effort. Kovarik family tells me at this time that Aly is dating someone in the Army Reserve.

224     Defendant(s) had any prior knowledge or interest in 11/3/2025.

225     Defendant(s) caused any aspect of the 11/3/2023 event.

226     Defendant(s) used the 11/3/2025 event to their gain in any way.

227     Defendant(s) used cyber intrusions on Sean James McBride prior to the 11/3/2025 event.

228     Defendant(s) used any in person intrusions on Sean James McBride and Aly Kovarik.

NEIGHBORHOOD

229     Plaintiff alleges he is being stalked and followed in his neighborhoods by contractors of the plaintiff.

230     Plaintiff alleges that in both Manorville and on the Upper West Side neighbors moved into neighboring residents with the intention of disturbing the plaintiff.

231     Defendant(s) used access in a client capacity to plaintiff's mother through her home based piano and voice lesson business.

232     Defendant(s) contracts with, hires, or associates with caregiver or presumed father of student, Lucy.

233     Defendant(s) pay any contractor or employee to monitor the McBride household.

234     Defendant(s) paid, incentivized or coerced anyone to take lessons at Leslie McBride Piano and Voice.

235     Defendant(s) used distressing and confusing tactics to intimidate the plaintiff.

236     Plaintiff neighborhood in Manorville and on the Upper West Side of Manhattan experienced irregular activity of street noises and loud intrusions.

237     Plaintiff experienced countless intimidation drivebys in his neighborhood in Manorville while out for a walk and while driving home. Plaintiff saw suspicious persons in multiple occasions while leaving the diamond district, on his street, in his apartment house lobby, as well as leaving the smoke shop in 2024, plaintiff saw an individual he believed is associated with the defendant(s).

238     McBride whereabouts were targeted directly by passerby.

239     Defendant launched fireworks, a known trauma of plaintiff, in Manhattan, 73rd st, and along sunrise hwy in Manorville in a coordinated manner to subdue plaintiff.

240     Plaintiff alleges these psychological manipulation and distress tactics are interrelated. Plaintiff believes defendant(s) engaged in this conduct to see what they could get away with, and to discover the legal barometer of stalking and pressuring New Yorkers in any context. Should these claims be shot down without reprimandation, businesses will intimidate and do surveillance on each other to no end. If the conduct can be recognized as coordinated intimidation tactics under a conspiracy then businesses will proceed faithfully and allow privacy to their colleagues as well as fellow New Yorkers. This age of technology has presented many temptations to New York and American businesses. Subtle ways of affecting individuals need review as criminal conduct.

POISONING

241    Defendant(s) drugged Sean James McBride.

242    Defendant(s) used psychedelic/ foreign substances in September, October, or November 2023 to psychologically manipulate plaintiffs.

243    Defendant(s) affected/ compromised plaintiff's home HVAC system while plaintiff was under the influence from foreign substances.

244    Defendant(s) realized he was under a foreign drug and went to sit in his family room on the first floor of the house to calm himself. The HVAC system proceeded to make a colossal disruption, "like the entire system fell out into the boiler room". A strenuous and frightening situation prolonged as plaintiff was startled by the disruption. Plaintiff could identify the noise he heard was indeed part of the family's heating system and not part of the effects of the drug.

245    Defendant(s) witnessed Sean James McBride through a monitor system the night he was drugged.

246    Defendant(s) drugged plaintiff with Lysergic Acid Dythylamide, commonly referred to as LSD.

247    Defendant(s) drugged plaintiff in a broader conspiracy to undermine plaintiff's mind and behavior.

FAMILY AND INSURANCE SCHEMEA

248    Defendant(s) targeted and used plaintiff's family members and friends to collect data for insurance purposes by stimulating reactions and responses from plaintiff, creating a habitat, as well as undermining and coercing the plaintiff. Defendant(s) made efforts to influence the plaintiff through trusted individuals.

249    Defendant(s) weaponized family members against the plaintiff.

•Weaponize - adapt for the use of a weapon

   •    exploit for the purpose of attacking a person or group, or for spreading discord

250    Defendant(s) intentionally vulnerabilized McBride family members.

251    Defendant(s) used or relied on a financial or security mechanism to put family members at risk.

252    Family members pressured the plaintiff at a fragile time. In 2024 ways that the family would keep in touch with the plaintiff changed and family interaction became hostile.

253     Family members would visit the plaintiff without notice in order to invalidate or test the plaintiff's work and clarity. Family would question plaintiffs sense of mental wellness for purposes other than the plaintiffs wellbeing.

254     Plaintiff believes that in context, excluding health events, his family members were targeted just as severely as he is.

255     Plaintiff alleges his family was "hijacked" and used to extricate him from work, being productive and to control him.

256     Plaintiff believes at this time, early 2024, the events happening to him were only shrapnel of some unrelated dealing or result of an election year until later in the year he recognized how direct and targeted the conspiracy against him personally is.

257     Defendant(s) profited from any behavior, product or service relating to the McBride family.

258     Defendant(s) used any tool, legal or illegal, to affect the future and future outcomes of McBride family and plaintiff.

259     Defendant(s) or parties acting in defendant's interests made in-person contact with McBride family members during the period 2019-today.

260     McBride family members and the plaintiff have been subject to any of the following: Projects, internal files or record, correspondence, monitoring, psychological manipulation, illegal surveillance, recording of private conversations, discriminatory harassment, conspiracy against rights, medical battery, medical deprivation, medical malpractice, or defamation.

261     Defendant(s) coerced family members into discarding plaintiff's personal belongings in summer 2023.

262     Discarding of childhood personal belongings from Manorville residence added stress to family and plaintiff's life.

263     Defendant(s) program to insinuate plaintiff's mental strife included family members discarding plaintiff's belongings.

264     Plaintiff believes his mother was manipulated into discarding several important childhood items belonging to the plaintiff.

265     Defendant(s) seeked revenge on plaintiff for his involvement in the Federal Reserve Bank and national security and attacked his personal items.

266     Defendant(s) wanted the plaintiff to get mentally ill by stealing his items.

267     Without smoking gun plaintiff believes McKinsey and Company had a direct role in stealing items from the plaintiff.

268     Defendant(s) used their position of power to take advantage of the plaintiff and McBride family.

269     Defendant(s) stands to gain from family behavior activity.

270     Defendant(s) stands to gain from influence over family behavior activity.

271     Defendant(s) targeted plaintiff's family in a context that relates to insurance.

272     Defendant(s) used family members against plaintiff to inflate an artificial need to rely on parents as a means of reducing the need for a strong insurance program for young people and for people in plaintiff's demographic.

273     In a social, insurance based context, the defendant(s) privileged themself to have more control over insurance outcomes and profitability if the plaintiff's health digressed, diagnoses were manufactured, and the general characteristics of the plaintiff were doing poorly.

274     Defendant(s) intentionally digressed plaintiff's health.

275     Defendant(s) intentionally manufactured diagnoses.

276     Defendant(s) intentionally created a profile of the plaintiff to suit their needs.

277     Defendant(s) used plaintiff's personal achievements and work, such as higher education certificate achievements, successful financial business track record, personal research projects, and other, as a write off, and to validate their program that they were doing enough to positively contribute and sustain the plaintiff.

278     Defendant(s) intentionally suppressed plaintiff and contributed benefits toward parents to support an unnatural development, manufactured family structure, and strangulation of the plaintiff.

279     Defendant(s) was a benefactor of plaintiff's insurance program.

LABOR

280     Defendant(s) inhibited plaintiff's labor outcomes directly.

281     Defendant(s) created or influenced labor outcomes of the plaintiff.

282     Defendant(s) works or contracts with East Moriches School District.

283     Plaintiff began working at the East Moriches School District in the summer of 2024.

284    Defendant(s) created a project to have plaintiff work at the East Moriches School District.

285    Plaintiff got referred to the school by a neighbor farmer while plaintiff was looking for work. Plaintiff suspects foul play from the Federal Reserve or security actors.

286    Defendant(s) created a project at the East Moriches School District to gain insight into the plaintiff in an environment where he would become comfortable and vulnerable.

287    Plaintiff alleges the defendant used a health "bug" to affect his thinking during this period of work with the intent on creating a psychosis in the plaintiff.

288    While at work at the East Moriches School District in the summer of 2024, plaintiff felt injurious activities in his heart, brain, and muscles consistent with other health wrongdoings of defendant(s).

289    Plaintiff describes the "bug" as some internal device, "like a pacemaker" with the ability to traverse the internal space of his body and lacerate organs, tissue and muscle. Plaintiff experienced sharp pains as well as queasy and drawn out pains of manipulation in his system.

290    Plaintiff alleges cyber intrusions during July and August 2024.

291    Plaintiff alleges aspects of working in a personal environment, the plaintiff's elementary and middle school, made it easy for defendant(s) to target sensitive memories, personal places, and the plaintiff's identity.

292    Plaintiff recalls having flights of thought during work, induced by some device or "bug". Plaintiff felt like his thoughts were being overridden. Plaintiff would come home from work shift every day and be bombarded with irregular thinking activity. Combined with muscle spasms, regularly experiencing his stomach being cut open by the "bug", racing heart, and brain trauma, plaintiff knew these symptoms weren't natural, but induced.

293    Plaintiff recalls all major access to his heart being cut off simultaneously, completely losing feeling in his arm, subjecting the plaintiff to panic.

294    Another event the plaintiff awoke from a nap, after a work shift, with a completely numb arm, plaintiff suspects a similar event of cutting his heart's accessways or restricting blood flow occurred in his sleep.

295    Plaintiff recalls his heart being cut, or detached from his internal system on multiple occasions during the summer of 2024, often late in the night.

296    During this period, plaintiff recalls the same offense, simultaneously cutting the access ways of his heart blood flow, whilst plaintiff was driving his car on E Lake in Montauk.

297    Plaintiff begins realizing these attacks are very personal during this time of employment.

298    Plaintiff recognizes many strange media events occur during this time.

299    Plaintiff struggled to piece together such strange events, especially in accordance with the physical trauma he was enduring on a daily basis although the irregular nature of the events doesn't directly impact the plaintiff it seemed relevant to what he was experiencing. Plaintiff alleges these events were planted or caused by the defendant(s) to catch the plaintiff off guard and to test him.

300    Plaintiff feared that if he sought medical attention or legal advice the doctors staff would invalidate him, laugh, or call him crazy. The serious and intentional nature of the attacks concealed culpability due to the social hurdles suffered by plaintiff.

301    Plaintiff was released from his job as a custodian at the East Moriches School District on the basis of a "bad mix", plaintiff alleges something else wasn't right with this matter and with the District. Plaintiff believes his working at the school was a ploy used by defendant(s).

302    Plaintiff alleges defendant created an outcome of instability and insecurity.

303    A week after being released from work, September 1st 2024 plaintiff experienced continued flights of health and sought medical attention at Stony Brook University Health emergency room.

304    Plaintiff alleges these events were manufactured by defendant(s) by inducing psychological and physical pain.

305    Plaintiff began working at Lowe's as an overnight stocker in November 2024.

306    Defendant(s) created labor outcomes with intent on discriminating against the plaintiff and causing the plaintiff undue physical, mental, and emotional strife.

307    Defendant(s) works or contracts with Lowe's in any way.

308    Defendant(s) has any business dealings with Lowe's Riverhead on Old Country Rd.

309    Defendant(s) created a project or circumstances to have plaintiff work at Lowe's Riverhead to put the plaintiff in uncomfortable, vulnerable positions and work scenarios. (The opposite circumstances from the East Moriches School) The plaintiff has been studied.

310    Plaintiff began working on a "night shift" mental rhythm, a feature of the employment that made him out of his comfort zone.

311    Defendant(s) was intentionally testing plaintiff's breakpoints.

312    Defendant(s) created circumstances to see plaintiff's behavior around racial minority groups on account of plaintiff's demographic. If the plaintiff wasn't a white male he wouldn't have been supervised the way he was by superiors and he wouldn't have suffered health problems while working at Lowe's.

313    Defendant(s) intentionally caused discomfort to plaintiff.

314    Defendant(s) monitored aspects of Lowe's Riverhead whilst plaintiff was employed there.

315    Defendant(s) influenced aspects of Lowe's Riverhead whilst plaintiff was employed there.

316    Defendant(s) directly or indirectly compensated staff at Lowe's Riverhead for purposes other than shift work.

317    Defendant(s) controls aspects of shift work at Lowe's Riverhead, specifically while plaintiff was employed there.

318    In November 2024, defendant(s) affected plaintiffs health with heart and brain irregularities, impairing him, preventing him from becoming comfortable in his new job.

319    On November 5th 2024, defendant(s) caused plaintiff health events, severe heart problems sent plaintiff to Peconic Bay Medical Center emergency room during his shift.

320    Defendant(s) racially profiled plaintiff.

321    Defendant(s) intentionally created a negative impression of the plaintiff with colleagues.

322    Plaintiff alleged defendant(s) are Lowe's stockholders and gained some access over Lowe's product during his tenure at Lowe's.

323    Defendant(s) was a benefactor of labour events experienced by the plaintiff. Plaintiff's issues at Lowe's were a basis to justify business means such as corporate, consulting controls and DEI initiatives.

READY WILLING AND ABLE

324    Defendant(s) had the opportunity to hire the plaintiff.

CYBER & DIGITAL CONSPIRACY

325    Plaintiff is victim of cyber conspiracy.

326    Plaintiff recognizes pattern of email inbox messages, as spam, relating to nicknames for real people beginning in 2020. Plaintiff sees some of these emails as an algorithm and interprets them in real life terms.

327    At times the plaintiff requested to be removed from the list of recipients of this mail.

328    Plaintiff received hundreds, if not a thousand emails over the course of 6 years from senders that plaintiff interpreted, mostly passively, as names of family members and names of Federal Reserve contact.

329    Plaintiff is a victim of UI Redress Attack at the direction of defendant(s) or party acting on defendant(s) behalf.

330    Persistent UI Redress Attack from 2022-2026 affected plaintiff's use and usage of the internet.

331    Plaintiff alleges that defendant(s) coordinated or permitted unauthorized access, monitoring, and manipulation of plaintiff's devices and communications during 2022-2026.

332    Plaintiff family members' devices have been compromised by cyber activity in a pattern such as to limit the freedoms of the plaintiff. Plaintiff believes this attack is coordinated to a broader program.

333    Plaintiff believes him and his friend Aly Kovarik are victims of cyber foul play.

334    Plaintiff needs a comprehensive review of cellphone data.

335    These cyber intrusions were persistent, sophisticated, and designed to create confusion, misrepresent communications, and manipulate plaintiff's decisions.

336    Cyber intrusions are a tool for conspiracy.

337    Plaintiff alleges that the coordination involved actors across multiple platforms, operating in parallel to magnify impact.

META DATA & SOCIAL MEDIA

338    Defendant(s) used a pattern of technological conduct to conspire against plaintiff.

339    Defendant(s) created an insurance program that involved monitoring behavior of the plaintiff on social media or phone activity including apps, messaging, calls, or other collected data.

340     Defendant(s) was a benefactor of grafting metadata and social media data collected surrounding plaintiff's cyber behavior and social media presence. Plaintiff alleges defendant built a model for use by social media companies and companies involved in data business. This model was built under the consent of terms in Meta's user agreement, without direct consent, and to the direct detriment of the plaintiffs identity and account behavior.

341     Defendant(s) had access to plaintiff's metadata.

342     Defendant(s) bought data relating to the plaintiff.

343     Defendant(s) sold data relating to the plaintiff.

344     Defendant(s) kept and stored data relating to the plaintiff.

345     Defendant(s) used targeted advertisements toward the plaintiff.

346     Defendant(s) had access to plaintiff's emails.

347     Defendant(s) had access to plaintiff's social media.

348     Defendant(s) had access to plaintiff's private social media accounts.

349     Defendant(s) had access to plaintiff's geolocation.

350     Defendant(s) intentionally harmed plaintiff with destructive data inputs.

351     Defendant(s) has personnel or a personal business network or contact at Meta.

352     Defendant(s) does business with or contracts with Meta.

353     Defendant(s) blocked correspondence between plaintiff with his followers, accounts followed, and friends.

354     Defendant(s) erased "direct messages" of plaintiff.

355     Defendant(s) inhibited access to friends accounts.

356     Defendant(s) inhibited functionality of plaintiff's account without proper cause.

357     Defendant(s) made a conscious effort to inhibit plaintiff's social life through inhibiting account functionality.

358     Defendant(s) personally attacked plaintiff's social media accounts in a permanent effort to stultify plaintiff's social life.

359    Defendant(s) used targeted behavior on plaintiff to advance business interests.

360    Defendant(s) used manipulative data strategy to solely target the plaintiff.

361    Defendant(s) used business networks at Meta, Snap, and Linkedin to suppress plaintiff's account and social media presence.

362    Social media presence is central to the relevancy, identity, and reputation of user's lives.

363    Meta, Snap, and Linkedin allowed defendant(s) to use manipulative tactics to psychologically defect the plaintiff. Coordinated targeting not only seeked to advertise to plaintiff or show him things that would be of interest, but seeked to influence long term life behavior of plaintiff in a predatory way. Plaintiff responded negatively to these attempts and believes coresponding activity against his accounts contributed to psychosis.

364    The plaintiff's ability to use Meta, Snap, and Linkedin thoughtfully has been affected by the defendant(s).

365    The plaintiff's ability to be targeted in conspiracy and in digital conspiracy was amplified through his use and presence on Meta, Snap, and Linkedin. The ongoing conduct of attacks against the plaintiff occurred with ease on the internet. Plaintiff saw a regular coordinated program on advertisements, "for you" content, and in posts made by friends. Plaintiff changed his behavior in unhealthy ways to subvert these attacks. Today, the plaintiff monitors social media behavior with a 30 minute timer to avoid being trapped in these apps.

366    Meta, Snap, and Linkedin would have known about corporations, agencies, or individuals targeting a user of their service.

367    Meta, Snap, and Linkedin sell their user data.

368    Meta, Snap, and Linkedin sell their user experience.

369    Meta, Snap, and Linkedin allow third parties to sell their data.

370    Meta, Snap, and Linkedin allow third parties to sell their user data.

371    Meta, Snap, and Linkedin allow third parties to sell their user experience.

372    Defendant(s) has any files or records relating to plaintiff's social media accounts.

373    Defendant(s) used social media accounts to control plaintiff's behavior, influence important life decisions and events, and to destroy culpatory evidence.

374      Defendant(s) used social media accounts to affect the plaintiff's psychological condition.

375      Plaintiff made a complaint through Instagram to its "Help" in summer 2024 claiming that the app wasn't functioning correctly, that the plaintiff was dissatisfied with the service, and the plaintiff needed expert attention to resolve account malfunctioning.

376      Defendant(s) has a strategy, program, or project relating to plaintiff's social media accounts and usage.

377      Defendant(s) targeted the lives of family, friends, followers, and followed accounts to show plaintiff things in order to manipulate his psychological and physical condition. For example, especially in the summer 2024, by coincidence, some dozens of plaintiffs followed accounts visited and posted pictures in France(statistically significant sum). Another example, posting habits changed, all of the posts from plaintiffs followed accounts only came in a group of several photos rather than individual picture posting. The algorithm that shows first photos behaved precariously. Plaintiff can't ascertain how although the first photos that pop up on the app seem to be influencing his opinions toward friends, conduct toward accounts in the app, and his own identity and account. This behavior of other accounts paired with the behavior of the new content algorithm was coordinated to addict plaintiff and influence life features. Plaintiff alleges the behavior of his family, friends, followers, and followed accounts may not be wrong against the plaintiff, although the technological subversion is. Plaintiff alleges in the context of the conspiracy against him the subtle technological subversion is a key facet of influencing him, alienating him, and creating a predictable pattern of user conduct that defendant(s) took advantage of without consent.

378      Defendant(s) has monitored plaintiff's social media using an AI or automated intelligence or keeps record of user data and interactions.

379      Defendant(s) has corresponded or socialized over plaintiff's social media activity in any private corporate setting.

380      Defendant(s) has used plaintiff's social media activity to defame him.

381      Defendant(s) has internal and external correspondence relating to plaintiff's social media usage.

382      Plaintiff's social media is subject to an irregular treatment by defendant(s).

383      Plaintiff's social media is subject to irregular treatment by social media companies.

384      Defendant(s) used plaintiff's social media activity as an input to an insurance program.

385     Defendant(s) used plaintiff's social media as part of a broader wrongdoing scheme.

386     Defendant(s) targeted a legal grey area in a conspiracy against plaintiff's rights.

## HOMELESSNESS & HOUSING PREVENTION

387     Defendant(s) induced and benefitted from plaintiff's homelessness by insinuating circumstances for an unreasonable expectation of risk for plaintiff's demographic based on key inputs attributed to plaintiff.

388     Defendant(s) prevented plaintiff from securing housing in order to manipulate insurance business and standards relating to the plaintiff or to the plaintiff's demographic.

389     Defendant(s) contributed directly to the plaintiff becoming homeless for 11 months both in Los Angeles and Long Island. Plaintiff experienced a physical internal attack, he subsequently feared for his life and fled New York to avoid issue. At the time plaintiff didn't realize he was being scapegoated on a national level to justify insurance premiums and rates attributed to broad based financial activity.

390     Defendant(s) profited directly or indirectly in any way due to the plaintiff becoming homeless. Specifically from interdependent conduct against the plaintiff.

391     Defendant(s) had any correspondence relating to plaintiff during plaintiff's homelessness either between co-conspirators or internally.

392     Defendant(s) had any business dealings relating to plaintiff during plaintiff's homelessness.

393     Defendant(s) intimidated plaintiff into homelessness.

394     Defendant(s) intimidated the plaintiff to flee New York.

395     Defendant(s) weaponized family members to displace plaintiff from an appropriate housing situation.

396     Plaintiff alleges defendant(s) interfered with his right to fair housing and intentionally created a dangerous situation to capitalize on plaintiff's deteriorating condition.

## HATE CRIMES & DISCRIMINATION

397     Plaintiff is a victim of a hate crime.

398     Defendant(s) is a benefactor of plaintiff's labeling as a racist or a bigot.

399    Defendant(s) manipulated insurance, financial business, and DEI quota on the basis of anything to do with plaintiff.

400    Defendant(s) had a product or a method of conducting business where a pattern of conduct existed to bait, mistreat, and erode the plaintiff on the grounds of his identity.

401    Defendant(s) avoided culpability from conspiracy by framing plaintiff as a racist. Defendant(s) justified their conduct due to this frame and profited from hysteria caused by frame.

402    Defendant(s) stood to gain leeway in business with plaintiff if contractors, employees, or any party viewed the plaintiff in a negative context, specifically regarding racism, xenophobia, or bigotry.

403    Defendant(s) used Diversity, Equity, and Inclusion initiatives as a scapegoat to discriminate against the plaintiff.

404    Defendant(s) bought information or collected and produced information to study plaintiff's tendencies regarding race.

405    Defendant(s) bought information or collected and produced information to study plaintiff's conduct toward anyone.

406    Defendant(s) used a predatory method to collect or study information about the plaintiff.

407    Defendant(s) refused to make any conclusions about the plaintiff, in turn, creating a dangerous situation for the plaintiff.

408    Defendant(s) manufactured any circumstances relating to the plaintiff.

409    Defendant(s) manufactured any circumstances relating to plaintiff regarding his personal views, sensitivities, or other conduct toward another demographic.

410    Defendant(s) used events experienced by plaintiff to label him in a defamatory manner.

411    Defendant(s) was negligent in conduct with plaintiff.

412    Plaintiff was targeted because of some component of his demographic.

413    Plaintiff was discriminated against because of his identity.

414    Plaintiff was targeted because of his race and gender.

415    Plaintiff was discriminated against because of his race and gender.

416	Defendant(s) furnished advertisements across multiple mediums, depicting African Americans and other races of humans in a pattern as to affect plaintiffs views toward others, because of his skin color and identity.

417	Defendant(s) furnished scenarios in Stony Brook University Hospital, overnight psychiatric facility. The plaintiff was punched by a black man in the inpatient facility.

418	Defendant(s) furnished scenarios in Lowe's, the plaintiff's workplace. Plaintiffs supervisors were racial minorities. Plaintiff alleges he was illegally surveilled in the workplace.

419	Defendant(s) furnished a scenario at a homeless shelter in Riverhead, NY. Plaintiff seeking safe housing found himself in a room of black men at Maureen's Haven in December 2024. Plaintiff was leered at inappropriately by homeless.

420	Defendant(s) furnished scenarios in Palisades Park. Over the course of a year in 2025 the plaintiff witnessed many incidents. A black man stole belongings from the plaintiff causing the plaintiff to descale the situation without hitting the man. Several people wearing a shirt with a monkey on it coordinated in some way as perceived by the plaintiff. A disturbed black man came up to the plaintiff and made remarks about his skin color and the plaintiff's skin color. Some man of a racial minority harassed the plaintiff over multiple days to get off the streets with expletives. A black homeless partially clothed man lingered on the same street as the plaintiff for several months. Plaintiff believes this person worked for the McKinsey Co. Many strange and subliminal experiences occurred in the Palisades Park, broadly speaking the plaintiff felt threatened by conduct as if due to his skin color and identity these instances were occurring in a coordinated way.

421	Defendant(s) furnished scenarios at the Santa Monica YMCA on 6th St in the spring of 2025. A black man approached the plaintiff with rude comments about being in someone's way. Plaintiff believes he was being stress tested or baited by this person.

422	Defendant(s) furnished scenarios along San Vicente Blvd.

423	Defendant(s) furnished scenario along 4th St, Los Angeles.

424	Defendant(s) furnished scenario with a mechanic in Los Angeles. The plaintiff needed his oil changed and hired a Spanish man with a crutch. The mechanic left to pick up lunch. The plaintiff paid the man and left with no issue. Plaintiff believes he was being monitored and evaluated. The thought of being evaluated in his conduct with anyone disturbed him greatly.

425	Defendant(s) furnished scenarios in Montaire Behavioral Health on Lubao Ave. Plaintiff was assigned a black girl as his therapist in a group residential treatment. The plaintiff was aggravated with the therapist and requested a change of therapist. Plaintiff believes this therapist was assigned to him on a basis other than to find the best treatment for him as a patient. Plaintiff believes as part of a coordinated effort defendant(s) was manufacturing

scenario in Montaire Behavioral Health to disturb plaintiff, upset him, and control his feelings toward people solely based on their identity. But for the plaintiffs identity he wouldn't have been targeted, monitored, or influenced to have extra sensitivity for racial minorities or anyone with a different identity.

426    Defendant(s) furnished scenarios in Starbucks on Montana Ave and 7th St.

427    Defendant(s) furnished scenarios in Nana's House, in March 2026 where his roommate, a black man named Lonny, had 2 seizures. Plaintiff doesn't know what to make of this incident. This scenario fits into the broad pattern of irregular conduct occurring in plaintiffs live.

428    Plaintiff's mental vacuity is damaged due to the conduct he's experienced.

429    Defendant(s) caused a conspiracy of hate crimes against plaintiff.

430    Defendant(s) used hate crimes to frame the plaintiff and cause a hyper vigilance in his conduct toward anyone with minority groups.

EVIDENCE SUPPRESSION & CULPABILITY

431    Defendant(s) suppressed evidence.

432    Defendant(s) intimidated and prevented plaintiff from bringing trial.

433    Defendant(s) made the plaintiff fear for his life.

434    Defendant(s) disturbed and affected plaintiff's inculpability. Defendant(s) created circumstances where plaintiff appeared to be playing a power game with big companies and agency, while in fact plaintiff feared for his life and didn't seek involvement with these entities other than his initial actions seeking employment at the Federal Reserve.

435    Defendant(s) used intimidation tactics to scare the plaintiff out of NYC. Plaintiff willingly lived out of his family minivan in Los Angeles in a conscious effort to avoid problems with defendants.

436    Defendant(s) used intimidation tactics to scare the plaintiff off of Long Island.

437    Defendant(s) makes a commitment to the responsible stewardship of their dealings.

438    Defendant(s) has a legal obligation to the responsible stewardship of their dealings.

439      Plaintiff alleges defendant(s) perused the frontier of legal ambiguity of what can be accepted as a standard of business in their harassment, intimidation and obstruction of plaintiff. Actions that individually are considered legal such as targeted marketing, being in public spaces, and other channels of interactivity have been pushed in a conspiracy against the plaintiffs rights as to establish precedent.

440      Defendant(s) measures activity of their dealings with a barometer of legality.

441      Defendant(s) used unsafe tactics in their dealing with the plaintiff. Plaintiff fears for his life.

442      Defendant(s) used government agency and compartmentalized roles of businesses as a weapon against the plaintiff.

443      Defendant(s) prevented access to government resources to plaintiff at times of making FOIA requests, police and detectives, DA.

444      Defendant(s) had counsel and legal strategy or any parameters relating to dealings with the plaintiff.

445      Defendant(s) had a strategy in any way relating to plaintiff and plaintiffs lawsuit.

446      Defendant(s) planted evidence, people, or furnished unrelated incidents to pollute the plaintiff. Defendant(s) seek to "unfocus" plaintiffs case by implementing hearsay or irrelevant sounding claims based on their actual conduct.

447      Defendant(s) used spoliation of evidence.

448      Defendant(s) attacked plaintiff with means that were intentionally difficult to record or prove.

449      Defendant(s) created disturbances in the plaintiffs life.

450      Defendant(s) furnished any medical treatment, interaction, or incident with plaintiff to distract from proof of plaintiff's inculpability of non-involvement with defendants.

451      Defendant(s) obstructed justice.

452      Defendant(s) created disturbances in public places in Los Angeles, summer 2025, garnering reaction and affecting the plaintiff, such as repetitive behaviors like clapping in the presence of plaintiff or stealing the plaintiff's laptop and backpack containing workbooks and notes about the case while plaintiff was homeless. Plaintiff, seeking to lie low and avoid problems is forced to recognize the personal nature of the attacks and wrongdoings in his life.

453     Defendant(s) financed and encouraged any overt acts against plaintiff.

454     Defendant(s) harassed plaintiff.

455     Defendant(s) used malicious intent against plaintiff.

456     Defendant(s) obstructed plaintiff from keeping records.

457     Defendant(s) stole plaintiff's handwritten records of trauma and wrongdoings from his backpack in the Palisades Park.

458     Defendant(s) created any constraints on the plaintiff.

459     Defendant(s) created a false narrative about the plaintiff.

460     Plaintiff made a FOIA request to NSA on 8/25/2025.

461     Plaintiff made a FOIA request to NSA on 10/19/2025.

462     Plaintiff made a FOIA request to NSA on 11/17/2025.

463     Plaintiff made a FOIA request to NSA on 2/9/2026.

464     Plaintiff made a FOIA request to NSA on 2/27/2026.

465     Plaintiff made a FOIA request to NSA on 3/4/2026.

466     Plaintiff made a FOIA request to NSA on 3/16/2026.

467     Plaintiff made a FOIA request to FRB on 12/3/2025.

468     Plaintiff made a FOIA request to the Federal Reserve Bank of New York on 12/3/2025.

469     Plaintiff made a FOIA request to the Federal Reserve Bank of Boston on 12/3/2025.

470     Plaintiff made a FOIA request to the Federal Reserve Bank of San Francisco on 12/3/2025.

471     Plaintiff made a FOIA request to NSA OIG in March 2026.

472     Plaintiff made a FOIA request to the DOJ in March 2026.

473     Defendant(s) knew about FOIA requests done by the plaintiff.

474     Defendant(s) delayed response to FOIA requests made by plaintiff.

475    Defendant(s) classified documents about the plaintiff at any time.

476    Defendant(s) made a violation by not responding to the FOIA request.

477    Defendant(s) obstructed from reasonable response to FOIA request by plaintiff.

478    Plaintiff contends that manipulation of his life circumstances through technology and government impedes his ability to make timely legal claims and several statutes of limitation are at risk due to deliberate concealment of culpatory evidence and alteration of inculpatory evidence.

479    Plaintiff alleges his access to critical records was obstructed.

480    The plaintiff witnessed countless events of inculpatory evidence destruction. Plaintiff alleges a complex software is constantly used on him to disturb, stimulate or heat him up. Plaintiff has been scathed in a way. The plaintiff avoided problems. Defendant(s) desired problems.

481    Plaintiff alleges culpatory evidence is at risk of destruction and needs ESI and SOR access from defendant(s).

482    Plaintiff is currently getting treatment for psychosis and for trauma associated with conduct herein and obstruction of this claim.

6. Pattern of Coordinated Conduct and Alleged Conspiracy

1    SUMMARY

483 Plaintiff alleges that defendants, acting individually and collectively, engaged in a coordinated pattern of conduct designed to interfere with plaintiff's life, reputation, health, and access to justice.

The conduct spans all relevant domains: digital communications, medical interventions, professional interactions, and evidence access.

The cumulative impact of these actions constitutes a deliberate and sustained interference with plaintiff's rights and well-being.

2    Cyber & Digital Conspiracy

484 Plaintiff alleges that defendants coordinated or permitted unauthorized access, monitoring, and manipulation of plaintiff's devices and communications.

These cyber intrusions were persistent, sophisticated, and designed to create confusion, misrepresent communications and manipulate plaintiff's decisions.

Plaintiff alleges that the coordination involved multiple corporate and federal actors across platforms, operating in parallel to magnify impact.

### 3    Medical Harm as a Tool of Conspiracy

485 Plaintiff experienced repeated internal and physical health events between 2023-today, with a major escalation in summer 2024.

Plaintiff alleges these medical harms were intentionally induced, manipulated, or exacerbated to damage plaintiff's reputation, impair decision making, and create circumstances favorable to defendant's interests.

Emergency medical interventions, involuntary psychiatric hold, and other health disruptions were used as tools to further reputational, social, and financial harms.

### 4    Reputational & Defamatory Coordination

486 Plaintiff alleges that multiple defendants participated in or permitted the deliberate dissemination of false, misleading, or damaging information, particularly in relation to professional and social engagements.

These actions were coordinated to create the appearance of wrongdoing by plaintiff and to protect the perceived propriety of defendant's actions.

### 5    FOIA & Evidence Suppression

487 Plaintiff alleges that defendants actively obscured, altered, or delayed critical records, making it difficult or impossible for plaintiff to document events accurately.

Plaintiff contends that both exculpatory and inculpatory evidence was manipulated to create a misleading narrative, implicating plaintiff as non-innocent while presenting defendants as lawful and proper actors.

Plaintiff's requests to the NSA and other federal agencies in 2025 were necessary to obtain records otherwise unavailable due to deliberate suppression, and defendants continued obstruction threatened plaintiff's ability to pursue claims within applicable statues of limitation.

### 6    Coordinated Multi-Domain Harm

488 Plaintiff alleges that the cumulative effects of cyber, medical, reputational, and evidence-suppression actions constitute a deliberate pattern of coordinated harm.

Defendants, acting individually and collectively, created an environment where plaintiff was unable to reliably document evidence, protect his health, or defend his reputation, while defendants were shielded from accountability.

The totality of this conduct demonstrates a coordinated effort to interfere with plaintiff's civil rights, human rights, and ability to seek legal redress.

7       Purpose and Effect of Alleged Conspiracy

489 Plaintiff alleges that defendant's actions were intentional, coordinated, and ongoing, with the purpose of :

* Creating insurance programs by using information about plaintiff to direct inputs for other people;

* Justifying exorbitant UCR rates for plaintiff's demographic and broadly across insurance business;

* Creating a profitability opportunity for private business;

* Falsely representing risks;

* Emphasizing health and insurance events of plaintiff to fraudulently represent risk associated with plaintiffs insurability;

* Manipulating evidence to create misleading narratives;

* Causing physical, emotional, and reputational harm;

* Obstructing plaintiff's access to clarity and legal remedies;

* Protecting corporate, financial, or governmental interests at plaintiff's expense.

As a result of this conspiracy, plaintiff has suffered substantial damages across personal, professional, and social domains, forming the foundation for the claims outlined in subsequent sections of this complaint.

7. Causes of Action

―――

COUNT I

Constitutional Violations & Civil Rights

(42 U.S.C. § 1983 / Bivens)

1.      Plaintiff repeats and realleges all prior allegations.

2.      Government Defendants, acting under color of law, deprived Plaintiff of constitutional rights, including:

- Fourth Amendment (unlawful surveillance, intrusion)

- Fifth Amendment (due process violations)

3. The conduct was intentional, coordinated, and without lawful justification.

4. Plaintiff suffered injury as a direct result.

———

COUNT II

Civil Rights Conspiracy

(42 U.S.C. § 1985)

1. Plaintiff repeats and realleges all preceding paragraphs, including the allegations set forth in Count III (Civil RICO), as if fully set forth herein.

2. Defendants, acting individually and in concert, reached a tacit and/or express agreement to deprive Plaintiff of protected rights and to engage in the coordinated conduct described in this Complaint.

3. Defendants' coordinated participation in shared pricing benchmarks, insurance profiling systems, and insurance business adjudication processes reflects a tacit and/or explicit agreement to carry out the unlawful scheme described herein. The consistency, timing, and interdependence of Defendants' actions would not be possible absent agreement among them.

4. The existence of this agreement is evidenced by Defendants' coordinated participation in the enterprise and pattern of racketeering activity described in Count III, including:

- Shared reliance on manipulated "usual, customary, and reasonable" ("UCR") benchmark rates

- Coordinated use of insurance profiling and health-related data

- Interdependent roles in insurance factor inputs, pricing determinations, and outcome enforcement

- Manipulating plaintiffs health events as a means of increasing plaintiff's insurability risk

- Federal agencies hired consultants, contractors, security experts to further a schedule to impede the plaintiff as to benefit businesses in the private sector. Tech companies were used as instruments into the plaintiff's life by private and government interests. Defendant(s) common purpose is to profit in insurance and other business by means of labeling

plaintiff as a key person either directly by defendant(s) or implicitly and subsequently labeling plaintiff as a high risk person for the purposes of raising industry wide UCR rates. Behavior in furtherance of private actors is knowledge of scheme, ignorance of reporting such a scheme, and profiting from this scheme. Implicit agreements connect individual actors into an enterprise. Each defendant took a role in this scheme.

5.    Tools for conspiracy:

- Rogue medical "bug" used to inflict health events

- "Business as usual" along with "it is what it is" among practicing enterprises

- Co-conspirators provided different roles in the scheme. Plaintiff believes either the Federal Reserve or McKinsey and Company have served as a hub of spokes between conspirators

- Dislodging family member interactivity and regular sense of family

- Cybersecurity and metadata

- Plaintiff homelessness

- Manipulation of plaintiff's identity, insurance profile along with destruction of plaintiff's social capital have served to justify the UCR scheme

5.    Defendants' actions were not independent or coincidental. The timing, uniformity, and interdependence of their conduct demonstrate a concerted scheme that would not be possible absent agreement.

6.    In furtherance of the conspiracy, Defendants committed overt acts, including those detailed in Count III, which were designed to implement and conceal the unlawful scheme.

7.    Defendants knew or should have known that such acts would deprive Plaintiff of constitutional and statutory rights and cause economic harm.

8.    The defendants' repeated, interdependent conduct—executed through standardized benchmark manipulation and coordinated interference against plaintiff—reflects a tacit agreement constituting (i) a fraudulent scheme, (ii) a civil conspiracy, and (iii) an association-in-fact enterprise under RICO.

9.    As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered injury, including financial loss, deprivation of rights, and associated damages.

_____

COUNT III

Civil RICO (Enterprise Including Insurance Misconduct)

(18 U.S.C. §§ 1962(c), (d))

8.    Plaintiff repeats and realleges all prior allegations.

9.    Defendants formed and operated an enterprise affecting interstate commerce.

10.    The enterprise included coordinated actors across insurance, financial, technological, and affiliated entities.

11.    Defendants engaged in a pattern of racketeering activity, including:

• Usual, customary, and reasonable ("UCR") benchmark rate manipulation across the industry, at Plaintiff's expense

• Coordinated use of interstate communications to effectuate such practices

• Obstruction-type conduct designed to conceal misconduct

• Intentional overt acts designed to conceal the severity of the attacks

12.    As part of the enterprise's scheme, Defendants caused, contributed to, or exploited health-related events and insurance profile events affecting Plaintiff.

13.    Such events were used to justify inflated pricing, adverse underwriting, and/or increased cost burdens imposed on Plaintiff's demographic.

14.    Defendants simultaneously interfered with Plaintiff's personal, professional, and economic life in a manner that amplified the financial impact of such insurance-related conduct.

15.    The racketeering activity was continuous and related, forming a pattern.

16.    Defendants' insurance-related conduct constituted an integral mechanism for economic harm, coercion, and unjust enrichment.

17.    Plaintiff suffered injury to business and/or property and physical and emotional injury by reason of these violations.

———

COUNT IV

Computer Fraud and Abuse / Cyber Intrusion

(18 U.S.C. § 1030)

14.    Defendants intentionally accessed Plaintiff's systems, devices, or data without authorization or exceeded authorized access.

15.    Such access caused damage and loss within the meaning of the statute.

15.    Manipulation of plaintiff's technology with intent of causing harm.

16.    Plaintiff suffered measurable harm.

_____

COUNT V

Tortious Interference (NY Common Law)

17.    Plaintiff maintained valid independence.

18.    Defendants intentionally interfered with plaintiff's inculpability.

19.    The interference was improper and without justification.

20.    Plaintiff suffered economic harm.

_____

COUNT VI

Medical Malpractice / Battery / Lack of Consent

21.    Defendant(s) deviated from accepted standards of care.

22.    Interventions occurred without informed consent (see NY Public Health Law § 2805-d).

22.    The plaintiff is being tortured.

23.    Such conduct constitutes malpractice and battery.

24.    Plaintiff suffered physical and emotional harm.

_____

COUNT VII

Intentional Infliction of Emotional Distress

25.   Defendants engaged in extreme and deliberate conduct.

26.   The conduct was intentional.

27.   Plaintiff suffered severe emotional distress.

15.   Plaintiff attempted suicide due to distress.

———

COUNT VIII

Conversion / Property Interference

28.   Defendant(s) intentionally interfered with Plaintiff's property, data, or assets.

28.   Plaintiff was deprived of sentimental and social capital.

29.   Plaintiff was deprived of use and value.

30.   Damages resulted.

———

COUNT IX

FOIA Violations

(5 U.S.C. § 552)

31.   Plaintiff submitted lawful requests under Freedom of Information Act.

32.   Federal Defendants failed to comply.

33.   Plaintiff is entitled to injunctive relief.

———

8. Witness & Evidence Index

• Plaintiff, medical providers, Federal Reserve officials, corporate witnesses, cybersecurity experts, social media & communications custodians, insurance company records, federal agency staff.

9. Prayer for Relief

Plaintiff Requests:

1       Compensatory & punitive damages;

2       Injunctive relief to prevent ongoing interference;

3       Injunctive relief to return stolen & missing property;

4       Court orders compelling evidence production from defendants;

5       Legal fees & costs;

6       Expunging, clarification, of medical and insurance records;

7       Any additional relief deemed appropriate.

10.Damages

Plaintiff seeks compensatory and punitive damages estimated at $1,000,000,000,000, subject to modification.

Appendix (F)

October 2019

Visited NY FED during university network event and tour of building.

Met Brian Gowan on tour as representative of alumni, administering tour.

October 2020

Began correspondence with Brian Gowan over LinkedIn messages.

Expressed gratitude for last year's university event, expressed interest in building network and in a career with the FRB system at this time.

Brian Gowan extends availability for meeting in NYC.

February 2021

Messages over LinkedIn continue.

April 2021

Follow up messages.

June 2021

Messages continue relating to lunch meeting.

July 2021

Lunch meeting arranged.

Lunch at the Russian Tea Room.

August 2021

August 23, 2021, call with Brian Gowan in reference to employment opportunity.

October 2021

LinkedIn messages. Congrats on job advancement.

(F) 2021–22

Asks Brian Gowan to speak to university club.

Finance Association meeting commences over Zoom with Brian Gowan as guest speaker.

February 2022

Meet Brian Gowan in NYC, coffee at Maman.

Discuss career opportunity.

Summer 2022

Meet Brian Gowan, lunch at Sheamus.

Discuss career opportunity.

August 2022

Interview for employment @ FRB NY

- Maria Ruff
- Kathleen
- Kristen
- Kelly

(Read 2/15/23 memo)

February 2023

Zoom call with Chris Armstrong, Resilience division head, VP FRBNY.

February 2023

Continued employment applications @ FRBNY and FRB.

January 2024

Attended event @ FRB NY 11/17 "how do you measure" at 33 Liberty St.

2024

Ceased communication with Brian Gowan.

Appendix (I)

Insurance Events

Health

Stony Brook University Medical - emergency room x2 8/28/2024 and 9/1/2024 and x1 overnight 9/1/2024 - heart attack and brain symptoms

Hindi Mermelstein - 2 meetings beginning 9/1/2024 - prescribed x2 medications for psychosis

Peconic Bay Medical Center - emergency room on 11/5/2024 - heart attack and brain symptoms

Medical Offices of Manhattan - routine health forms for employment led to testing on plaintiff's heart revealing an AV block.

Grace Woods Psychotherapy - 10 weeks of psychotherapy beginning in 1/2025

Montauk Behavioral Health - 1 month residential treatment beginning 4/12/2025

Sunrise Laboratories

NYU Langone – Oleski, MD

Nicole

Mary

Ralph - family therapist - plaintiff's father wanted plaintiff to see this therapist in 2026 - plaintiff in his recognition of health events building into an insurance scheme refused the service - this led to dispute, deterioration, and police intervention between plaintiff and his father

Family Service League - plaintiff, in preparation for court begins seeing Matt in March 2026 at family service league to work on self, recover from trauma, and recover from suicide attempt - prescriptions x2 for psychosis continue

Sun River Health

Change Insurance - drop Blue Cross Blue Shield from UnitedHealth Group for Medicaid

Irregular attendance to health care routine, warped by defendant(s) to label plaintiff as irregular, irresponsible, and a risk:

Medication for psychosis and trauma - multiple irregular prescriptions

Dr. Kelly ENT Southampton

Kreitzberg Dental - missed dental appointments while in Los Angeles

East End Fitness - closed gym membership for financial reasons

NY Sports Club - closed gym membership for financial reasons

Santa Monica Family YMCA - closed gym membership for financial reasons

Road Running - irregular

Bryant University Gym - irregular

Bryant University Mental Health Services

Bryant University Health Services

City MD

Food regularity - lack of regular food routine - food stamps/SNAP benefit

Vehicular risks:

No car ownership

Safe driver record

Induced risky behavior changed plaintiff's safe driver record when he drove cross country in fear

Ticket in McIntosh , OK

Removed from parent insurance for road

Fender bender – San Vicente Ave, CA

Lived in family minivan

Mechanic activity on 4th St, Santa Monica

Stolen ID, passport

Periods of no driving, NYC resident

Housing - Inconsistent/Problematic:

2014-2018 High school - Manorville, New York

2018-2022 College - Manorville, New York

- Smithfield, Rhode Island (Bryant University)

- W73rd St

2022-Today Post-Graduate - Manorville, New York

- W73rd St

- Homeless, Santa Monica, Los Angeles

- Emergency temporary housing, Riverhead, New York

- Homeless shelter, Nana's house, Center Moriches, New York

Occupation - Unsteady:

2016-2023 - Westhampton Country Club

2017-2020 - Discovery Land Company

2021 - ITS, Nomura

2022 - Think Equity

2023 - McBride (self owned/ operated financial)

2024 - East Moriches School District

2024 - Lowe's

2025 - California Food Stamp + Cash

2026 - Suffolk County DSS TA + SNAP

Drugs:

None 1+ year

Historical

Marijuana - Daily

Cocaine - High School, over a period of weeks

Psychedelic Drug - High School + College, one time use

Currently prescribed Rispiridone and Hydroxzyne

Appendix (M)

MEMO 2/5/2023

(Plaintiff record. Plaintiff impression that he experienced some participation with Federal employees, in various locations, mostly on UWS in Manhattan, during his employment proceedings in New York.)

"What I've experienced in the past 2 years, more specifically since September 2022 has been enlightening, bolstered my understanding of the security of our world, and ultimately led to profound conclusions about my own life. Starting in September, a series of improbable events began occurring, some of which pushed me to the extremes of questioning my own reality. I began and continued pursuit of a job at the FRB years ago and in September I was forced to take on more acute assumptions for how to live my life and seek intellectual stimulation. I've essentially been mocking in my mind, the idea that anybody and everybody has access to my cellular data, movements, even what I'm thinking, and in spite of this, drawn myself towards rational interests of self and society.

The folks who go to work everyday and collect psyched from the Reserve Bank, iterate the policy and do the job descriptions of their mandate. However, to say that the average person there actually has any power is absurd. What I assume is the NSA and other security aparati direct the social habitats that each person experiences on a daily basis, and this occurs in very deep and profound ways. I've always thought there must be a system that keeps the government safe, just never realized I'd be exposed to it in such a direct way through my job applications to FRB careers. This Pandora's box was opened when I first reached out to an alumni my freshman year of college. Eventually I met this alumni in person and we spoke and met several times after that. At some point I realized I couldn't possibly be communicating with this person without security measures in place. At this point I had 2 interviews last August, 2022 and have zoomed with another FRB manager(Head of Operations and Resilliency), I am past the point of interest, and I've begun the socialization. With the eye in the sky looking out for me, it hasn't mattered that I'm not in the Liberty Street offices, I'm still interacting and experiencing

the FED on a daily basis. With a little luck  and social skill, I hope the security gurus will stay in my corner and guide me towards all that I must accomplish with my life."

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

1 Suicide attempt - counselor sessions  2 Brain damage, forgetfulness, aloofness, brain death - emergency room and CAT scan  3 Severed organs and heart - emergency room visits, trauma therapy  4 Nervous and muscular atrophy - none  5 Psychosis and confusion - mental health professionals and perscription drugs  6 Physical erosion as result of homelessness - personal care routine

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

Federal Reserve Board , Reserve Bank of New York, Reserve Bank of Boston, Reserve Bank of San Francisco - $350 Billion McKinsey and Company - $50 Billion BlackRock - $50 Billion Blackstone - $50 Billion UnitedHealth Group - $14.285 Billion State Farm - $14.285 Billion Progressive - $14.285 Billion Geico - $14.285 Billion Allstate - $14.285 Billion Liberty Mutual - $14.285 Billion AIA Group - $14.285 Billion Apollo Global Management - $50 Billion Apple Inc. - $100 Billion

Alphabet Inc. - $100 Billion  Meta Platforms, Inc. - $50 Billion  Snap Inc. - $25 Billion

Nomura Holdings - $25 Billion  Point 72 Asset Management - $10 Billion

Leidos Holdings, Inc. - $10 Billion  Booz Allen Hamilton Holding Corporation - $10 Billion

Peter Thiel - $25 Billion  Elon Musk - $50 Billion  Department of Justice - $10 Billion

Department of Defense - $10 Billion  National Security Agency - $10 Billion  Donald

Trump - $10 Billion  Jones Day - $10 Billion  Federal Bureau of Investigation - $10 Billion

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 4/17/2026 | | *Sean James McBride* |
| --- | --- | --- |
| Dated | | Plaintiff's Signature |
| Sean | J | McBride |
| First Name | Middle Initial | Last Name |
| 215 Railroad Ave | | |
| Street Address | | |
| Suffolk County, Center Moriches | New York | 11934 |
| County, City | State | Zip Code |
| 631-405-9066 | Seanmc2000@yahoo.com | |
| Telephone Number | Email Address (if available) | |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑ Yes    ☐ No

> If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.